**UNITED STATES for Use and Benefit of MAGNOLIA PETROLEUM CO. v. CORE & PLANCHE et al.**

No. 893.

District Court, W. D. Louisiana, Shreveport Division.

Jan. 27, 1945.

R. A. Fraser, of Grimmet, Boatner, Simon & Carroll, all of Shreveport, La., for plaintiff.

L. Percy Garrot, of Shreveport, La., for Robinson & Young and Glassell-Taylor Co.

Cook, Clark & Egan, of Shreveport, La., for St. Paul Mercury Indemnity Co.

PORTERIE, District Judge.

This action arises under and is authorized by the Act of August 24, 1935, 49 Stat. 793, 40 U.S.C.A. §§ 270a to 270d, known as the Miller Act, and is based upon the contractual and statutory obligations of the prime contractor and its surety under the contract and bond made with the United States Government under the First War Powers Act of 1941, 50 U.S.C.A.Appendix § 601 et seq., and on the payment bond which guaranteed prompt payment "to all persons supplying labor and material in the prosecution of the work provided for in the contract."

In July, 1942, two contracting firms, Robinson & Young and Glassell-Taylor Company, acting as associate contractors, entered into a contract with the United States of America for the construction of certain public works, consisting of perimeters and dispersal taxi-ways, concrete aprons, hard standings, etc., as part of the Army's airdrome near De Ridder, Beauregard Parish, Louisiana, within the Western District of Louisiana.

Pursuant to the requirements of the statute, these contractors, together with their surety, the St. Paul Mercury Indemnity Company, executed and delivered to the United States the statutory form of payment bond, for the protection of all persons supplying labor and materials in the prosecution of the work provided for in said contract and for the use of each said person.

Defendant Core & Planche was a subcontractor under Robinson & Young and Glassell-Taylor Company and as such performed certain parts of the construction work on the airdrome. The work undertaken by the subcontractor was to "furnish, haul, spread, and set up sand-clay-gravel base" for the runways, etc., of the airdrome.

The use plaintiff seeks judgment against the contractors, subcontractor, and the surety company in the sum of $5,509.15, with 5% per annum interest thereon from the date of the institution of this suit, until paid, for the value and price of oils, gasolines, and other petroleum products sold and delivered to the subcontractor, Core & Planche, between the dates of October 1, 1942, and February 5, 1943, for the performance of its work on the airdrome under the contract above set out.

First, we shall discuss the applicable law in this case in order that we might determine as to whether or not all the facts are to be considered, or whether or not certain facts are to be entirely excluded under the applicable legal principles.

We subscribe to the manner of consideration of and the conclusions made under the Miller Act in the case of United States v. Ætna Casualty & Surety Co., D. C., 56 F.Supp. 431, 435. The first item of the conclusions of law by Judge Hincks, the one with which we are most vitally concerned in the instant case, reads as follows: "It is not essential to a recovery by a materialman on the payment bond required under the Miller Act that the materials furnished to a subcontractor by delivery *at the site of the work be thereafter actually incorporated into the project.*" (Italics ours.)

It follows that the first important point of law to decide, and it is to be drawn from the proved facts, is whether or not the gasoline and oil furnished the subcontractor in the instant case by the use plaintiff was delivered "at the site of the work."

Delivery at the site would preclude the necessity of proof by the use plaintiff that the oil and gasoline went "in the prosecution of the work provided for" (quotation from the Miller Act, 1935, 49 Stat. 793, 40 U.S.C.A. § 270a).

However, in the case that the delivery was not actually made at the "site," the use plaintiff is not precluded from supplying by proof the basic and legal requirement for its judgment, that is, that the oil and gasoline are actually incorporated into the work.

Now let us see what was the physical situation. The airdrome within which these runways were to be constructed by the prime contractor was already established in the woods at a distance of four and one-half miles from the town of De Ridder, Louisiana, when the contract before us was made. The subcontractor established a filling station in the town of De Ridder for the reception and distribution of oil and gasoline that was to be used in the transportation to the airdrome runways of sand, clay, and gravel from a pit (Gimmich) already open near the town of De Ridder. This pit was so situated as to the airdrome that the town of De Ridder was on a straight line in between. Therefore, the ready and practical explanation as to why the subcontractor established its gasoline and oil tanks in the town of De Rid-

der itself instead of having them placed at the airdrome immediately at the site of the work was that the first material to be transported was from the Gimmich pit.

It came to pass in the course of furnishing material for the runways, for some engineering reason, that gravel, sand and clay had to be found and taken from other pits in the vicinity, two in number, and these were not located relative to the airdrome such as to put the town of De Ridder in a straight line in between. This necessitated extra mileage travel, and it is the contention of the defendant prime contractor that, under the statute, and particularly as to the prime contractor's bondsman, the oil and gas had to be used in the work and not for other purposes. We agree. There seems to be little objection to trucks hauling from the Gimmich pit to the airdrome, but it is contended that trucks making trips to either one of the other two pits did not have to pass the filling station in De Ridder, and that, in consequence, a nine-mile (maximum) round trip (2 x 4½ miles) from the airdrome to the filling station at De Ridder for replenishment of fuel was added unnecessarily.

Then, it is advanced, this apparent poor exercise of judgment in the location of its oil and gas supply away from the actual site of the work is further magnified from the fact that two-thirds of the trucks used in the sand-clay-gravel pits did not belong to the subcontractor, but were rented from various truck owners who lived in the neighborhood, and some of them as far away as twenty-four miles from the site of the work. There might be serious debate on the point as to whether or not the filling station at De Ridder was at a convenient place.

There was a fleet, on the average, of about thirty trucks used. Ten were owned and about twenty were rented by the subcontractor. These trucks would report in the morning at the filling station, and were allowed to take gasoline and oil at wholesale prices. They would sign a credit slip. The trucks were then driven to the airdrome site to ascertain if any material was needed. Without going into the reasons for it, it is true that sometimes there was work and sometimes there was no work. If there was hauling to be done, the trucks would then go to one of the pits and haul the type of material which the foreman or engineer was ready to use. If there was no work, the truck driver was free to go wheresoever he pleased and burn the gasoline and oil as he saw fit, either to work at another job or to travel at his pleasure.

All of these claims would, at first blush, seem to be very much against the recovery by the use plaintiff for the price of his oil and gasoline. But we believe that since eventually the truck drivers did perform work, and since they were paid by the load, and there is no proof in the record that any of these owners of trucks or drivers left unpaid bills at the filling station of the subcontractor, and since all of the credit slips were collected against actual work done (hauling material to the job), the claim by the prime contractor that it is not liable for the value of this supposedly misused oil and gasoline falls.

The final situation was that the truck owners and drivers paid for all the oil and gasoline purchased by them out of the pay for their actual labor that went to the job. The best illustration is offered by one of the main witnesses for the prime contractor, H. M. Johnson, who was one of the drivers, to-wit:

"Q. Core and Planche let him have gas and took it from the price they paid him for hauling? A. They did every individual truck that way.

"Q. In other words, it was a part of the labor or expense of doing the job they had to do, getting the use of the truck and the driver? A. The way it was, we would get gasoline whenever we wanted it. We would sign a ticket. Whenever we got paid—whenever our check came, they deducted that amount from the check.

"Q. They would take that amount from the cost of delivering the gravel? A. Yes, sir, and if we had anything coming after the gas was taken out, we got it."

It is evident that what payment this witness received was for actual transportation of sand-clay-gravel to the site of the airdrome.

The prime contractor is not disengaged from paying the claim sued upon, since Johnson paid for any and all oil and gasoline he used in whatever manner out of the amount that he was due for actual work performed—hauling of materials to the site.

It is true that Johnson lived twenty-four miles from the job site and drove forty-eight miles to and from work each working

day; that, if he found no work upon arrival at the pit, after loading with gasoline at the filling station, he drove off and sought work elsewhere; that he did use gas and oil bought at the De Ridder filling station to propel his truck in the hauling of dirt at Camp Polk; that on two occasions he took a load of soldiers to Elizabeth, Louisiana, a trip of eighty miles each time; that he rode around at night for his own pleasure, using the gas and oil purchased at the De Ridder filling station; that the oil and gasoline he bought at the filling station was his to do with as he liked, and to use for such purposes as he chose.

Nevertheless, he paid the cost of all this oil and gasoline out of his accumulated earnings in actual hauling of sand-clay-gravel to the site. The situation is just as if he had taken cash for his actual work of hauling and then out of this money paid for these bills of oil and gasoline, which is no different in essence than if he had bought clothes or shoes for himself, wife, and children. It is to be remembered that the actual work of hauling certainly was labor "in the prosecution of the work provided for."

However, there is proof in the record of the use of oil and gasoline taken from this De Ridder filling station to transport the entire fleet of subcontractor's equipment and trucks a distance of one hundred miles to work on an entirely different job than the airdrome runway of the instant case. From the record there was but one occurrence.

■ We have made a computation on a basis most favorable to the prime contractor (maximum factors culled from the testimony of one of the prime contractors), to-wit, as follows: four miles to the gallon for one truck, one hundred miles takes twenty-five gallons for one truck, the round trip then takes fifty gallons for one truck; assuming that the whole fleet of thirty trucks was used thus, not only the ten trucks of the subcontractor, but the twenty rented trucks, that would make a total of exactly fifteen hundred gallons. This at 17¼ cents per gallon (taken from uniform price on sales slips) makes $258.75. We believe this amount is not collectible by the use plaintiff, for the record is devoid (differently from the use of oil and gasoline previously explained) of any proof that this was paid by any money representing labor or hauling in the prosecution of the particular work. The subcontractor just took the gasoline from the filling station and that ended the transaction.

We allow fifty gallons for the round trip of one truck. The prime contractor, on the witness stand, says, "It would take somewhere around twelve to fifteen gallons each to go from De Ridder to Alexandria." So, the round trip would be only thirty gallons, according to him. Yet, we are allowing fifty.

There is in the record the sole statement made by one of the prime contractors: "And also, (they) drove their heavy equipment over there at least once or twice, motor patrols, and even drove a wobble wheel roller and tractor one night in which they filled up with materials they claim on the De Ridder Airdrome which they used from there going a hundred miles to Alexandria." The items of equipment are more fuel-consuming than the hauling trucks, but since they number only two small tractors, one motor patrol and a dragline, and still allowing for the attachments to these, and since there are as many as thirty trucks, we believe another $258.75, the amount allowed for fueling the trucks, is very ample.

■ Hence, in order to preclude the contention that the prime contractor and its bondsman are being made to pay a cent for labor or material that did not go into the subcontractor's job, we shall allow another $258.75 to be deducted from the total amount claimed. This, in the opinion of the court gathered from the whole record, protects the defendant prime contractor and its bondsman fully and beyond question. The deduction of this $517.50 is not allowed the subcontractor. As to it, judgment will be allowed as prayed for in full. Also, the counterclaim of the bonding company is allowed against the subcontractor.

The proof is indubitable in that the airdrome runways were built. They were built with sand, clay, and gravel coming exclusively from these pits opened and operated by the subcontractor. It took gasoline and oil to propel the trucks engaged in this transportation. No one else furnished any oil and gasoline for the purpose. No one but the use plaintiff sold oil and gasoline to the subcontractor at any time during the existence of this job, or before, or after.

There is proof in the record of the want of prudent diligence by both the subcontractor and the prime contractor. The

head people in each case, particularly the leading partners of each, seemed not to have given the situation sufficient personal observation. Their visits to the area were very few and far between.

The general factual situation brought out in this case is not one peculiar to the job, but rather one normal to the job, because of the nature of the work to be done.

■ Payment for the oil and gasoline as furnished easily comes under the Act. There has been a broad and liberal construction of the statute and the bond. See Standard Accident Insurance Company v. United States, for Use and Benefit of Powell, et al., 5 Cir., 89 F.2d 658, and numerous cases cited therein.

■ The prime contractor and its bondsman have urged strongly that the evidence by use plaintiff in the proof of its claim of $5,509.15, is in part, first, inadmissible, and then finally, not proved with the legal certainty necessary to warrant a judgment.

The evidence is by Mr. Planche, one of the two members of the firm of subcontractors, that "the materials purchased from the Magnolia Petroleum Company were used by us in the trucks, which trucks hauled our supplies to the De Ridder Air Base, and were used in the construction work under the aforementioned contract."

And then the invoice slips which are of record, showing the purchase in the aggregate of $5,509.15, are admitted by him to be correct; further, that the oil and gasoline under each slip was delivered and received.

Those same facts are admitted by the office manager of the subcontractor. Both of these gentlemen (and we have no reason not to believe them, though their evidence was taken by deposition) further state that the gasoline, Diesel and lubricating oils in the aggregate amounting to the sum of $5,509.15 were "used in trucks for hauling supplies and in construction work done under the aforementioned contract."

The further facts are that the district credit manager of the use plaintiff filed in evidence all of the original invoices (photostats have been substituted by permission of the court) showing by these one hundred twenty-seven invoices the aggregate sale of $5,509.15. It was further proved that these invoice slips were in triplicate, one left at the office of the district credit manager, one left with the representative of the subcontractor at the filling station, and one left at the office of the local commission agent of the use plaintiff at De Ridder.

Connectedly, this local commission agent testified that he made himself a dozen deliveries to the De Ridder filling station, eight or ten deliveries to the Cooley pit, and, further, that to his own direct knowledge deliveries were made by his drivers for each and every one of the invoice slips. This same witness, who lived and still lives at De Ridder, unequivocally stated that he knew well and personally all the parties who received and signed for the delivery of the oil and gasoline for the subcontractor. He added that the names signed on the slips were the well-known and accepted names of these parties. In answer to the question by the Court: "How do you know they were signing for Core and Planche? Was it their business to sign for them?" he answered, "Well, they were either a dragline operator or in charge of the station wherever the gasoline was delivered."

These slips are fully informative, and among the numerous items there are two very important ones, to-wit: "Goods Received By", and there follows in each case in writing the signed name of the person receiving for the subcontractor at the De Ridder filling station or at the tank at the Cooley pit, or at place of the equipment. An examination of the invoice slips will show that there is the actual signature of this agent accepting delivery. And the other important item is that in the blank after "Business" appears "Runway contractor, Airport."

We absolutely find the facts to make a case of that certainty that we consider legally competent and sufficient to sustain a judgment.

The objection by counsel for the prime contractor is that the various signers for the goods received as agents for the subcontractor should have been brought to court in person and have testified to the actual receipt for the gasoline of each invoice. There has been no information or suggestion that the signatures were forgeries, and the testimony of the local commission agent of the use plaintiff is accepted as reliably true by the court that these various drivers did work there, to his direct knowledge. Further, the evidence will show that at the suggestion of the court the witness took each invoice slip, and by the signature of the particular driver indicated in each case the situs of delivery, as to whether or not it was at De Ridder

(as most of them were) or at the Cooley pit (the only pit with a tank), and the rest (a substantial number) showing delivery at the air base.

Judgment will be signed in conformity with the above opinion upon presentation.